UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

**CARLOS A. CRUZ BAEZ, et al.**
**Plaintiffs**

v.

CIVIL NO.: 01-1619(DRD)

**ISIDRO NEGRON IRIZARRY, et al.**
**Defendants**

## OPINION AND ORDER

Plaintiffs[1] filed  suit against co-defendants[2] pursuant to 42 U.S.C. § 1983 alleging violations to their constitutional rights as guaranteed in both the Federal Constitution and the Constitution of the Commonwealth of Puerto Rico.  Furthermore, plaintiffs claim damages pursuant to Articles 1802 and 1803 of the Civil Code of Puerto Rico, 31 P.R. Laws Ann. §§ 5141, and 5142. In essence, plaintiffs sustain they were object of adverse employment actions due to their political beliefs.

During the month July 2005, plaintiffs presented their case in the ongoing jury trial proceeding in this matter.  Now, before the Court is defendants' *Motion for Judgment Under Rule 50(A)*.  (Docket No. 160).  Through said request, defendants move the Court to grant judgment pursuant to Fed.R.Civ.P. 50(A) in their favor arguing, to wit: 1) plaintiffs Jusino, Olivera, Baez, Casiano, Justiniano, Velez, Flores, Berrocales, Colon, and Irizarry failed to bear their *prima facie*

---

[1]  After summary judgment was issued, along with reconsiderations thereto, only fourteen plaintiffs remained: nine (9) Law 52 – Juan Jusino Amely, Santos Olivera Rivera, Nery Casiano Rosado, Sylvia Flores, Jesselle Justiniano, Marla Colon Johnson, Jose Luis Berrocales, Felipe Velez Valle, and Nelida Baez Perez – whose contracts were not renewed after December 31, 2000 upon the change in administration; three (3) career plaintiffs – Lisbette Valberdi Sanabria, Marisa Ramirez Negron, and Marisol Sanabria – who were allegedly unlawfully deprived of their duties, were transferred, and salaries reduced; one (1) trust employee – Maria Del Carmen Vargas Calderon – who used to be the Internal Auditor and was substituted by a PDP member; and Pedro Irizarry Bonilla, a contract employee, who was hired during the electoral ban.

[2]  Although the case initiated with a long list of co-defendants only three remain: The Municipality of San German, Isidro Negron Irizarry (the mayor) and Ramón Segarra (Human Resources/Personnel Director).

burden on the First Amendment claim to establish a political link to the actions of which they complain; 2) plaintiffs Ramirez, Sanabira, and Valverdi failed to bear their *prima facie* burden on their First Amendment Claim for their "short of dismissal" claims; 3) plaintiff Vargas does not have a cause of action due to her position as Internal Auditor being one for which political affiliation is a proper consideration.

## I.  RULE 50 STANDARD

Fed.R.Civ.P. allows a litigant in a trial by jury to move the Court, at any time before submission of the case to the jury, for the entry of judgment as a matter of law against any party who has been fully heard on an issue.  *See* Franceschi v San Carlos Hospital, 326 F.Supp.2d 257 (D.P.R. 2004).  When deciding a motion for judgment as a matter of law, as Fed.R.Civ.P. 50 allows, the district court must examine the evidence and draw any inferences in the light most favorable to the nonmoving party.  *See* Mangla v. Brown University, 135 F.3d 80 (1st Cir. 1998); Cardona Martinez v. Rodriguez Quinones, 306 F.Supp.2d 89 (D.P.R. 2004).  However, even when obligated to draw all rational inferences form the facts in favor of plaintiff, plaintiff is still not entitled to inferences based on speculation and conjecture.  *See* Vazquez Valentin, *infra*.  Moreover, the Court is prohibited from considering the credibility of witnesses, resolve credibility conflicts in testimony, or weight the evidence.  *See* Segrets, Inc. v. Gillman Knitwear Co., 207 F.3d 56, 65 (1st Cir. 2000); Katz v. City Metal Co., Inc., 87 F.3d 80 (1st Cir. 1996) (*citing* Richmond Steel, Inc. V. Puerto Rican Ins. Co., 954 F.2d 19, 22 (1st Cir. 1992)); Cardona Martinez, 306 F.Supp.2d at 91.  Thus, the Court will not, for any reason, enter into considerations regarding the credibility of witnesses or the weight of the evidence introduced at trial precisely because Rule 50 bans said act.  *See* Alvarez Fonseca v. Pepsi Cola Bottling Co. of P.R., 152 F.3d 17, 23 (1st Cir. 1998) *cert. denied*, 526 U.S. 1123, 119 S.Ct. 1778, 143 L.Ed.2d 806 (1999).

Furthermore, in order for the Court to submit an issue to the jury, the opposing party to a Rule 50 motion must provide "more than a scintilla of evidence and may not rely on conjecture or speculation" to be able to withstand judgment as a matter of law.  Id.  Plaintiffs must have introduced at trial "sufficiently adequate evidence for the jury to determine the plausibility of a particular fact." Ponce v. Ashford Presbyterian Community Hospital, 189 F.R.D. 31 (D.P.R. 1999) aff'd, 238 F.3d 20 (1st Cir. 2001).  Therefore, to grant a Rule 50 motion, the Court must find that, **as a matter of law**, the record would only permit a reasonable jury to reach one conclusion as to the issue in controversy. That is to say, judgment as a matter of law may only be granted when the evidence "is such that reasonable minds could not differ as to the outcome." Mangla, 135 F.3d at 82.  The First Circuit has been quite stringent when holding that, under a Rule 50 standard, the district court must "determine whether there are **facts** and **inferences reasonably drawn** form those facts which lead to but one conclusion – that there is a **total failure of evidence** to prove plaintiff's case." Vazquez Valentin v. Santiago Diaz, 385 F.3d 23, 30 (1st Cir. 2004) (citing Mayo v. Schooner Capital Corp., 825 F.2d 566, 568 (1st Cir. 1987)) (emphasis ours).  If, on the contrary, a fair minded person could draw different inferences form the evidence presented at trial, the matter must be left for the jury to decide. See Espada v. Lugo, 312 F.3d 1, 2 (1st Cir. 2002); Acevedo Feliciano v. Ruiz Hernandez, 275 F.Supp.2d 162, 164 (D.P.R. 2003).

## II.  POLITICAL DISCRIMINATION CLAIMS

A.    Generally:

It is settled law that when a plaintiff institutes a claim of political discrimination, he or she, undoubtedly, bears the burden of producing sufficient evidence, be it through direct or circumstantial means, that he or she engaged in a constitutionally protected conduct and that his or her political

affiliation was the **substantial or motivating factor** behind the challenged adverse employment action. *See* Mt. Healthy City Bd. of Educ. v. Doyle, 429 U.S. 274, 287, 97 S.Ct. 568, 50 L.Ed.2d 471 (1977); Guzman Ruiz v. Hernandez Colon, 406 F.3 31, 34 (1st Cir. 2005); Gonzalez de Blasini v. Family Department, 377 F.3d 81, 85 (1st Cir. 2004); Cosme Rosado v. Serrano Rodriguez, 360 F.3d 42, 47 (1st Cir. 2004).  Accordingly, said plaintiff is **obligated** to point "to evidence on the record which, if credited, could permit a rational fact finder to conclude that the challenged personnel action occurred and stemmed form a politically based discriminatory animus." LaRou v. Ridlon, 98 F.3d 659, 661 (1st Cir. 1996) (*quoting* Rivera Cotto v. Rivera, 38 F.3d 611, 614 (1st Cir. 1994)); *see also*, Cruz Baez v. Negron Irizarry, 360 F.Supp.2d 326 (D.P.R. 2005).  Consequently, even when circumstantial evidence may be sufficient to support a finding of political discrimination, plaintiffs must make a **fact specific** showing that a **causal connection** exists between the adverse employment action and their political affiliation.  *See* Aviles Martinez v. Monroig, 963 F.3d 2, 5 (1st Cir. 1992).

However, the First Circuit has established that knowledge of political affiliation cannot be merely established through testimony of having been seen, or, for that matter, met during routine campaign activity participation, having been visited by the now incumbent defendant while said defendant was a candidate to the position he now holds, by having held a trust position in the outgoing administration, by having political propaganda adhered to plaintiff's car and/or house, or through the knowledge of third parties.  *See* Gonzalez Pina v. Rodriguez, 407 F.3d 425, 432 (1st Cir. 2005) (holding that, even if the opposing party mayor was aware of plaintiff's support for a rival mayoral candidate in the primary, that, by itself, is insufficient to establish political *animus*); Gonzalez de Blasini, *supra* at 85-86 (affirming the dismissal of a complaint concluding that, even though plaintiff was alleged to be a well known supporter of the NPP, had held a trust position under

the previous NPP administration, and defendant had expressed interest in giving her position to a PDP member, this fell short of evidence that defendant knew of plaintiff's political affiliation); Vazquez Valentin, *supra* (holding that meetings during routine campaign canvassing do not lead to a reasonable inference that defendant knew of political affiliation at the moment of reviewing personnel files); Cosme Rosado v. Serrano Rodriguez, *supra* at 48 (holding that the statement of PDP major of intent to rid town of NPP activists was insufficient to generate genuine issue of material fact); Camilo Robles v. Zapata, 175 F.3d 41, 43-44 (1st Cir. 1999) (holding that evidence must be presented that defendant was either the primary actor involved in, or a prime mover behind, the underlying violation); Acevedo Diaz v. Aponte, 1 F.3d 62, 69 (1st Cir. 1993) (holding the fact that plaintiffs were conspicuous targets for discriminatory employment action by defendants because they played prominent roles in publicly and vocally supporting a former mayor was not enough).  Thus, asserting inequity and tacking on a self-serving conclusion that defendant was motivated by discriminatory *animus* does not suffice as the *prima facie*-fact specific showing that a plaintiff was a victim of political discrimination.  Id.

Finally, if plaintiffs succeed in making a *prima facie*-fact specific showing of political discrimination, judgment as a matter of law cannot be entered against said plaintiff for defendant is allowed to prove, by preponderance of the evidence, that the adverse employment action would have been made regardless of the employee's political affiliation.  Id.  This particular defense commonly referred to as the *Mt. Healthy* defense requires, thus, that defendant show, by a preponderance of the evidence, that the decision to terminate employment would have been made regardless of the employee's political beliefs.  Defendants must also establish that they would have taken said corrective action against all employees in similar position to plaintiffs' – or otherwise show that they would have taken the corrective action either way – regardless of political affiliation.  *See* Sanchez

Lopez v. Fuentes Pujols, 375 F.3d 121, 131 (1st Cir. 2004).  If said evidence is credible and nondiscriminatory, the burden is shifted, once again, to plaintiff where he or she must make a showing that political affiliation "was more likely than not a motivating factor."  Padilla Garcia v. Rodriguez, 212 F.3d 69, 74 (1st. Cir. 2000).  Logically, then, plaintiffs may still prevail if it is found they would not have received the same treatment 'but for' their political affiliation.  *See* Acosta Sepulveda v. Hernandez Purcell, 889 F.2d 9, 13 (1st Cir. 1989).

B.      "Short of Dismissal":

In "short of dismissal" causes of actions, as is the cause of action brought forth by some of the plaintiffs herein, plaintiffs have to show, through preponderance of the evidence, that the diminution in their duties was motivated by discrimination based on political affiliation; and, by clear and convincing evidence, that the challenged actions resulted in a work environment "unreasonably inferior" to the norm for the position.  *See* Gonzalez Pina v. Rodriguez, 407 F.3d at 431-32; Ortiz Garcia v. Toledo Fernandez, 405 F.3d 21 (1st Cir. 2005); Acosta Orozco v. Rodriguez de Rivera, 132 F.3d 97 (1st Cir. 1997); Agosto v. Agosto de Feliciano, 889 F.2d 1209, 1218-20 (1st Cir. 1989); Agosto v. Aponte Roque, 800 F.Supp. 1033, 1037 (D.P.R. 1992).  Furthermore, in guiding district courts as to the application of the "unreasonably inferior" prong of the *prima facie* analysis, the First Circuit Court has explained that this determination rests upon whether "the government's actions are sufficiently severe to cause reasonably hardy individuals to compromise their political beliefs and associations in favor of the prevailing party."  Agosto de Feliciano, 889 F.2d at 1217.  Again, if this two-pronged showing is met, then judgment as a matter of law is inapposite for defendant would have the right to contest plaintiffs' *prima facie* claim of "short of dismissal" due to political discrimination by demonstrating that the adverse employment action would have been made regardless of the employee's political affiliation.

Albeit, the First Circuit has translucently upheld that an employee who has lost merely the perks of his position; whose job has been substantially narrowed, but retains supervisory authority over matters of comparable significance to those taken away; who had been a supervisor and had worked independently and lost said independence, or *vice versa*; and who is given one or two short-term assignments that are below his rank **do not** meet the unreasonably inferior standard.  On the contrary, he who was left with only a few routine and technical assignments, or no significant assignments at all; whose job functions remain largely the same, but is excluded from policymaking sessions; who retains her job duties, but is criticized harshly and on a nearly daily basis and never provided with guidance on how to improve, and/or transferred to an undesirable office space **do meet** the unreasonably inferior standard.

C.    <u>Trust Positions</u>:

As explained above, in political discrimination cases, plaintiff has to first show that party affiliation was a substantial or motivating factor for the challenged action.  Once this is proven, the burden shifts to the defendants.  They must, then, make a showing that, either a non-discriminatory reason was the true object of the challenged employment action, or that plaintiff held a "political" position for which party affiliation constituted an appropriate qualification for continued employment.  *See* <u>Branti v. Finkel</u>, 445 U.S. 507, 218, 100 S.Ct. 1287, 1294-95, 63 L.Ed.2d 574 (1980); <u>Elrod v. Burns</u>, 427 U.S. 347, 96 S.Ct. 2673, 49 L.Ed.2d 547 (1976); <u>Ortiz Pinero v. Rivera Arroyo</u>, 84 F.3d 7, 12 (1st Cir. 1996).  This is widely known as the *Branti/Elrod* defense which is designed to ensure that the "representative government not be undercut by tactics obstructing the implementation of policies of the new administration, policies presumably sanctioned by the electorate."  <u>Elrod</u>, 427 U.S. at 367, 96 S.Ct. at 2687).

Furthermore, "[w]hether a government position is 'political' does not depend upon such loose-fitting labels as *substance of the duties inherent in the position itself*."  Ortiz Pinero, 84 F.3d at 12 (*emphasis in original*).  Accordingly, a position could very well be considered political even when it is neither confidential nor policymaking in character.  On the other hand, party affiliation could not be a relevant consideration for all policymaking or confidential positions.  *See* Ortiz Pinero, Id.; Romero Feliciano v. Torres Gaztambide, 836 F.2d 1, 3 (1st Cir. 1987).  Finally, in order for the Court to properly identify "political" positions, a two-pronged test has been created under the *Branti/Elrod* analysis:

> First, we inquire whether the overall functions of the employee's department or agency involve "decision making on issues where there is room for political disagreement on goals or their implementation."  Second, we decide whether the particular responsibilities of the plaintiff's position, within the department or agency, resemble those of a "policymaker, privy to confidential information, a communicator, or some other office holder whose function is such that party affiliation is an equally appropriate requirement" for continued tenure.  Among the indicia material to the second element are "'relative pay, technical competence, power to control others, authority to speak in the name of policymakers, public perception, influence on programs, contact with elected officials, and responsiveness to partisan politics and political leaders.'"

O'Connor v. Steeves, 994 F.2d 905, 906-07 (1st Cir. 1993) (*quoting* Jimenez Fuentes, 807 F.2d at 241-42, *cert. denied*, 481 U.S. 1014, 107 S.Ct. 1888, 95 L.Ed.2d 496 (1987); *see also*, Ortiz Pinero, Id.

### III. DISCUSSION

1.  Employment Opportunities Development Fund Contract ("Law 52") Plaintiffs:

**Juan Jusino Amely:** Plaintiff Juan Jusino Amely is an NPP affiliate who worked as an electoral college poll station officer for the NPP in the 2000 elections.  He was also the Duey Alto NPP ward chief for the 2000 elections.  He participated in several political activities.  Mr. Jusino testified that he began working as a security guard at public works within the Municipality of San

German in 1998 through 2000.  His employment ceased upon the new Mayor Negron Irizarry taking office.  The former NPP Mayor Llantin knew him because Mr. Jusino had worked in his political campaign.  Docket No. 163 at 6-8.  He would participate in the motorcades and would sometimes go into businesses and have some drinks, go to the club, have parties, and sell food to raise funds.  Id. at 13, ln. 18-20; at 19, ln. 24-25.  However, he did not hold a leadership position within these, and there was nothing that would make him stand out among the other people at those activities.  Docket 164 at 12, ln. 20-22; at 13, ln. 2-6.  He also testified that he would pass by the PDP club in his car and yell at them, while he  was identified with NPP party flags.  Docket No. 163 at 21-22.  However, he did not meet Negron Irizarry, the PDP now incumbent Mayor, until November 2000 at Villa Chilin where the Mayor first met with all employees under Law 52 contracts and those that were transitory in nature.  Id. at 22, ln. 6-9, 22.  **More telling is his testimony that he "imagined" the PDP Mayor knew his political affiliation because he wrote his name down as a participant as polling station officer so that he would be given the day off, and because Mr. Rodriguez, one of the aides in sanitation, knew of his political affiliation.**[3]  Id. at 24.  Furthermore, he clearly stated that, during campaigning activities, the PDP candidate for mayor did not see him.  Id. at 27, ln. 14-15.  He testified that he was not re-hired because, as Negron Irizarry explained, "Law 52 had only given him some 40 positions and that those positions, he was using it for the most necessary personnel that he needed."  Id. at 10, ln. 11-13.  The Court rules that this employee failed to make a *prima facie* case of political discrimination because he failed in showing, even by reasonable inferences, that the defendant Mayor knew of his political affiliation at the time of determining who was to be re-hired. *See* Acevedo Diaz, 1 F.3d at 66.  Furthermore, there was no evidence that Rodriguez, who knew of

---

[3]  But there was no proof that Rodriguez participated with the Mayor in the selection of those Law 52 employees to be eventually re-hired.

his political affiliation, advised the Mayor of his political affiliation, or that Rodriguez participated in the adverse decision.

**Santos Olivera Rivera:** Plaintiff Santos Olivera Rivera is an NPP activist who actively participated in several NPP political activities.  He worked as an electoral college functionary for the NPP during the 2000 elections.  His house is also identified with NPP propaganda.  His Law52 contracts has been consistently renewed in the past until his last appointment as Mayor's Aide which expired on December 31, 2000.  He testified that he was employed as a brigade supervisor in the Rosario ward of San German from "two years before 2000."  Docket No. 164 at 53, ln. 15-19.  His last position as a Law 52 employee for the Municipality of San German was as assistant to the previous NPP Mayor.  Id. at 68, ln. 12-5.  Olivera Rivera also testified that he participated in campaign activities in favor of the NPP candidate for mayor in the elections of 2000 by "driv[ing] around in my marked Jeep or my Jeep with signs."  Id. at 59, ln. 12-13.  He would also participate in motorcades, and political meetings.  Id. at 60, ln. 1-2.  He purports this same reason (that he "almost always drive[s] around in [his] car with signs on them [sic]", and that he would travel with former NPP Mayor's pictures around) as the reason why Negron Irizarry knows of his political affiliation.  Id. at 63, ln. 2-6.  This plaintiff also failed to show that the Mayor, or any other person making the decision together with the Mayor, knew of his politically protected conduct and, hence, that his protected conduct was a "substantial or motivating factor" for the alleged adverse employment action of not renewing his Law 52 contract.  *See* Acevedo Diaz, 1 F.3d at 66.

**Nelida Baez Perez:** Plaintiff Nelida Baez Perez is an active NPP supporter who participated in several NPP activities – walk-abouts, gatherings, motorcades, etc.  She held the position of Secretarial Aid in the Department of Health.  Her husband, Andres Cruz Franceschi, used to be Assemblyman for the New Progressive Party under, and appointed by, former NPP Mayor.  Docket

No. 152 at 12, ln. 13-25.  Between 1997 and 1998, she began working for the Municipality as Secretary Aide in the Health Center.  She was later sent to the Department of Labor, and, eventually, finished her tenure at the Municipality within the Department of the Family on December 31, 2000 – date of her contract's expiration.  Id. at 15, ln. 20-22.  Ms. Baez Perez testified that her contract was not renewed because of her political affiliation.  She merely states that "it is logical."  Id. at 16, ln. 8-9.  She also testified that she knew Negron Irizarry because, during the political campaign, he went to visit her house – the only house in her ward identified with flags and pictures of the candidates – as he did all of the houses of said ward.  Id. at 17, ln. 16-18, 23-24.  However, they did not talk politics during that visit.  Id. at 19, ln. 18-19.  Ms. Baez Perez continued to testify that her husband is a good friend of Negron Irizarry.  Id. at 25, ln. 22-24.  The Court, by an inference, deducts that when the Mayor visited her house, he knew her identity because of his already knowing her husband quite well.  Hence, the Mayor, it is a reasonable inference that the jury can make , at the time of the taking the decision not to renew, the defendant Mayor knew that she was an NPP affiliate having seen flags in her house – a house which the Mayor identified prior thereto as that of his good friend (plaintiff's husband).  Hence, the Mayor, when renewing the contract, could have placed a face in an identified house with a contract renewal.  There is, thus, sufficient evidence at this point in time to connect her political affiliation as a "substantial" or "motivating factor" to the non-renewal.  *See* Vazquez Valentin,385 F.3d at 30 (*citing* Acevedo Diaz, 1 F.3d at 66).

**Nery Casiano Rosado:** Plaintiff Nery Casiano Rosado is an NPP follower who participated in several political activities and whose house and car are identified with NPP propaganda.  His Law 52 contracts were always renewed until his last appointment as a laborer at the Public Library.  He worked in the Department of Labor, in the file room, before being transferred to the Public Library.  Docket No. 152 at 55, ln. 2-4.  That contract expired on December 31, 2000.  He supported the

former NPP Mayor's electoral campaign in 2000 by attending activities, and having his car clearly identified with panels and flags. Id. at 56-57, ln. 25, 1-2. He testified to having known Negron Irizarry, but not having any personal contact with him. Id. ln. 6-7. Nevertheless, he continued to explain that Negron Irizarry would pass by his house and they would say hello, and, on one occasion, the Mayor, while campaign canvassing, went to Mr. Casiano's house and Mr. Casiano "received him well, shook his hand, and spoke for a while." Id. at 58, ln. 4-7. Mr. Casiano also testified that defendant knew of his political affiliation because, not only did everyone in San German knew it, besides the front of his house being very well identified, but because defendant's mother lives, or used to live, in the same place where Mr. Casiano's mother lives. Id. ln. 12-15. The Court determines that plaintiff has not met the threshold required under Acevedo Diaz, 1 F.3d at 66. The Court cannot make any inferences based on the mother's political belief. There is no proof as to the mother's political belief or that the Mayor knew of her political affiliation. There is also no guarantee that the son must have the same political belief as the mother. Furthermore, and most critical, a candidate visiting a house of a voter, even when well identified, *per se* does not provide him with knowledge considering the thousands of houses visited by candidates. *See* Vazquez Valentin, 385 F.3d at 37.

**Jesselle Justiniano Rosario:** Plaintiff Jesselle Justiniano Rosario worked as an electoral college functionary for the NPP in the 1996 and the 2000 elections. Her Law 52 contract was repeatedly renewed until her contract expired on December 31, 2000. She had worked for the Municipality for around three years. Her last appointment was that of Office Clerk assigned to the Department of Education. She supported the former NPP Mayor's electoral campaign by committee activities, and as a polling station officer. She would also go to walks, and motorcades. Docket No. 152 at 85, ln. 4-16. She testified that she first had contact with Negron Irizarry **after** he was elected

when she went to City Hall to request employment.  Id. ln. 20-23.  There is no proof that the defendant Mayor knew of her political affiliation at the time the contract was not renewed.  There is a lack of *prima facie* case.  *See* Acevedo Diaz, 1 F.3d at 66.

**Felipe Velez Valle:** Plaintiff Felipe Velez Valle has always been an NPP follower who participated in several political activities.  He was extended a Law 52 contract by former NPP mayor.  He worked under said contract for three, and some odd, years prior to its expiration.  Docket No. 166 at 7, ln. 4.  He worked at "anything [he] was sent to do."  Id. at 9, ln. 15.  Mr. Velez Valle testified to knowing present PDP mayor Negron Irizarry from seeing him around in the streets of San German, and from when he went to request employment with him.  Id. a11, ln. 15, and 24.  He also testified that Negron Irizarry knew of his political affiliation because Luis Rodriguez – his former supervisor – knew of his political affiliation.  Id. at 19, ln. 12.  No proof that Luis Rodriguez advised the Mayor of plaintiff's political preference or that Luis Rodriguez participated with the Mayor in the selection of those whose contracts were to be renewed under Law 52.  Consequently, plaintiff failed to make a *prima facie* showing of political discrimination.  *See* Acevedo Diaz, 1 F.3d at 66.

**Sylvia Flores Morales:** Plaintiff Sylvia Flores Morales is an NPP activist who had an EODF position (Law 52) as a clerk assigned to work at a school.  Her Law 52 contract was repeatedly renewed until her last contract expired on December 31, 2000.  She supported NPP by going on motorcades, and posting bills.  She first met incumbent PDP mayor Negron Irizarry when he gathered a group of people at City Hall **after** he had taken possession of office.  Docket 166 at 31, ln. 15-18.  She also testified that Pablo Salas, her ex-brother-in-law was appointed to perform equal or similar duties to the ones she used to perform at the school.  Id., ln. 8.  Plaintiff failed to provide a *prima facie* case as to the Mayor knowing of his political affiliation.  Merely meeting the Mayor after the

election when the Mayor met all the employees of the Municipality does not prove he knew of his political affiliation.  Plaintiff has failed in the first step of a §1983 claim.  *See* LaRou, 98 F.3d at 661.

**Jose Luis Berrocales Baez:** Plaintiff Jose Luis Berrocales Baez was actively involved in several NPP political activities.  He began working for the Municipality on August 2000 until his last appointment expired on December 31, 2000.  He testified to supporting the NPP by being a member of former NPP mayor's advance team, attending meetings, posting bills, gathering funds, and attending committee meetings.  Docket 166 at 75-76, ln. 25, 4-8.  Mr. Berrocales Baez "assumes" mayor Negron Irizarry knew of his political affiliation back in 1999-2000, not only because he was always meeting him at the walks, walk-abouts, motorcades, Id. at 76, ln. 18-22, but because Negron Irizarry use to call him "the Big One"; he further had an altercation with Negron Irizarry's driver during the posting of bills in the 2000 campaign, Id. at 77, ln. 5-11, and because he heard Negron Irizarry later speaking on a radio show regarding an alleged charge against Berrocales Baez for distributing unfairly offensive campaign literature through the streets of San German with his wife – fellow plaintiff Ms. Lissbette Valverdi Suris.  Id. at 79.  In this case in particular, plaintiff clearly meets the *prima facie* requirement due to his having testified to having listened to the Mayor on a radio show denounce him, prior to being elected, as distributing offensive campaign literature.  The Mayor, thus, knew at the time of renewal of the contracts that Berrocales was an NPP affiliate, together with his wife.  There was sufficient circumstantial evidence not to renew the Law 52 contract as a "substantial or motivating factor."  *See* Acevedo Diaz, 1 F.3d at 66.

**Marla Colon Johnson:** Plaintiff Marla Colon Johnson's last Law 52 contract lasted from July 1, 2000 to December 31, 2000 where she labored at the Property Registry, as an Office Clerk.  She was actively involved in several NPP activities, and was part of former NPP mayor's advance team.  She also appeared in a campaign television advertisement with prominent NPP candidates along with

a multiplicity of other people.  Docket No.171, at 59, ln. 18-25.  During former NPP mayor's 2000 campaign, she was a member of the advance team, participated in motorcades, sold tickets for activities, attend meetings, and helped out as needed.  Id. at 60, ln. 13-18.  She testified knowing Negron Irizarry because "he is from my town."  Id. at 65, ln. 22.  Notwithstanding, she testified to not having "met him *per se*."  Id. at 66, ln. 7.  She met him during the house calls Negron Irizarry made during the campaign.  House calls by a Mayor *per se* do not pass muster as to party political affiliation considering the thousands of houses visited by candidates, even if the houses are politically identified.  *See* Vazquez Valentin, 385 F.3d at 37.  There is no other evidence that the Mayor knew of her political beliefs.  Finally, there is also a complete lack of proof as to whether the Mayor actually saw the campaign commercial in which she appeared or, for that matter, whether her participation in the commercial was that of a prominent nature as juxtaposed to her just being part of a mass of people surrounding the candidates.  Plaintiff, thus, failed to comply with a *prima facie* showing of political discrimination.  *See* Vazquez Valentin, 385 F.3d at 30; Acevedo Diaz, 1 F.3d at 666.

Recapitulating, after having carefully reviewed each plaintiff's testimony, the Court finds that **Juan Jusino Amely**, **Santos Olivera Rivera**, **Nery Casiano Rosado**, **Jesselle Justiniano Rosario**, **Felipe Velez Valle**, and **Marla Colon Johnson's** evidence is not sufficient to show that their political affiliation was a substantial or motivating factor in defendants' decision not to renew their Law 52 contracts.  Moreover, the evidence adduced at trial did not move the Court to conclude that a *reasonable inference* could be made that defendants were aware of their political affiliation at the time their individual personnel files were reviewed.  The plaintiffs merely rested on "having been seen" or "met during routine campaign canvassing" assertions to support their claims for political discrimination, and, as the First Circuit has held, provided that meetings during routine campaign

canvassing does not lead to a reasonable inference that the candidate Negron Irizarry knew that they were members of the NPP at the moment their personnel files were reviewed, <u>Vazquez Valentin</u>, 385 F.3d at 37-38.  The enumerated plaintiffs were not able to shift the burden of persuasion to the defendants.  Accordingly,  **Juan Jusino Amely**, **Santos Olivera Rivera**, **Nery Casiano Rosado**, **Jesselle Justiniano Rosario, Felipe Velez Valle**, and **Marla Colon Johnson's** claims are **DISMISSED**.

Finally, upon reconsideration of **Sylvia Flores Morales**'s claim, as requested by defendants in open court, after the court had originally determined that she reached the statutory threshold, and after reviewing, once again, her testimony, the Court proceeds to grant the reconsideration and **DISMISS** her claim for the same reasons discussed above.  She also failed to provide sufficient evidence determinative, at this initial stage of the burden of proof, that a reasonable inference could be made by the jury that defendants knew of her political affiliation at the moment of reviewing her personnel file.

2.    <u>Career Employees</u>:

**Marisol Sanabria Irizarry:**  Plaintiff Marisol Sanabria Irizarry is a career employee who is affiliated to the NPP.  During the 2000 electoral campaign, she was a member of the advance political team for the former NPP Mayor, and had worked as an electoral college functionary at the voting polling places since attaining legal age.  She began her employment with the Municipality in the trust position of Municipal Secretary (**she had transferred from a career position with the Commonwealth of Puerto Rico in the Drivers Service Center**), and was appointed Administrative Assistant in September 2000.  She testified that former NPP Mayor, and mayor at that time, sent her a letter indicating that she was being transferred to a career position of administrative aid where she

kept the Mayor's diary, coordinated meetings with the assembly, kept records of the ordinances and executive orders of the mayor, and handled or saw to the public.  Docket No. 165 at 13, ln. 1-3, 20-22.  Her workstation, prior to the transfer, was located in City Hall and her salary was that of $1,400.00 a month.  Id. at 14, ln. 9-13.  However, her salary was reduced to $1,000.00 per month – the salary the job announcement to which she applied published as the salary for her position – in May of 2001 under Negron Irizarry.  Id. at 28, ln. 3-5.  About two weeks after Negron Irizarry was sworn in as the new Mayor, she was then transferred from City Hall to the Recycling Office, and her salary was reduced a few days after her transfer.  She was replaced by two employees to perform the duties she had been carrying out at the Municipal Secretariat's office.  Id. at 43, ln. 19-22.  At the recycling plant, her employment entailed the classification of all the incoming waste that is recycled, such as aluminum, cardboard, plastic, paper, and glass, but, mainly, she was instructed to handle the phone and register the phone calls, and, akin to laborer, to classify waste when there was nothing else to do.  Id. at 17 - 23, and 26.  She is still classified as an administrative aide working at the recycling plant.

She testified to the fact that she had always supported the NPP over the years holding the positions of poll station officer, ward president, and a member of the advance team.  Docket No. 164 at 78, ln. 3-4.  In particular, she supported the former NPP Mayor's candidacy in the 2000 elections as member of his advance team, helping him with the electoral challenges, raising funds, and making the flags.  Id. at 80, ln. 6-8.  Her testimony revealed that Negron Irizarry had known Sanabria for the past fifteen to twenty years – ever since he was his microbiology professor at the InterAmerican University in San German.  Id. at 87, ln. 2-7.  She also stated that Negron Irizarry knows of her political affiliation "because we would meet in the political motorcades  [...]  I would pass by his committee and I would see him and he would see me, and in these recent elections, I had to receive

them when he asked me for documents from the transition committee." Id. at 88, ln. 13-17.  The only verbal exchange during these campaign activities was the occasion in which "Mr. Santiago yelled at [her] Gorda sucia, dirty, fat person."  Docket 165 at 62, ln. 12-15.  However, prior to the Mayor taking the decision to transfer her, he knew of her political affiliation because she was holding a position wherein her functions were that of trust where politics constituted an appropriate consideration for the job, Administrative Aide to the Mayor handling his calendar, coordinating meetins with the Assembly, keeping record of the ordinances and executive orders of the Mayor, and handling the public for the Mayor in the Office of the Municipal Secretariat.  Id. at 13, ln. 20-22.  Furthermore, although she did not have an official position in the transition committee of the outgoing NPP Mayor, she worked for said committee and the newly elected PDP Mayor knew this fact.  A reasonable jury could hold that her transfer was "unreasonably inferior," See Gonzalez Pina, 407 F.3d 425, and/or the actions short of dismissal were "sufficiently severe to cause [a] hardy individual to compromise their political beliefs [...] in favor of the prevailing party."  Agosto de Feliciano, 889 F.2d at 1217.

**Lisbette Valverdi Suris:**  Plaintiff Lisbette Valverdi Suris is a career employee who is an active member of the NPP.  She has participated in several NPP political activities.  She also worked as an electoral college functionary, and has been a member of several NPP advance political teams.  She testified having supported the NPP by participating in the walk-abouts, motorcades, posting bills, collecting money, and visiting homes.  Docket No. 167 at 5-6, ln.22-25, 1-4.  She began working for the Municipality during February 1999 as an office clerk in the Office of Human Resources.  Id. at 10, 16-22.  She then became a career employee in July of 2000 as a secretary in the Human Resources Office.  Id.  Her employment with the municipality terminated on July 9, 2004.  Id. at 38, ln. 25.  As a secretary, she would handle professional contracts with the municipality, the bids, and,

in the event the mayor was not present, she would represent the mayor and she would handle the administrative aspect of the office of the municipal secretary with vouchers, bids, and with bidders when they came in to tender their bid documents.  Id. at 12, ln. 1-7.  She was also employed as a trust employee under the previous mayoral administration.  Shortly after Negron Irizarry took office, she was transferred back to a career position.  Once Negron Irizarry took office, her salary was withheld until she was assigned to a work station.  She was, then, reinstated to the Human Resources Office where she was given a stool as her work station and was told they did not have any tasks for her to perform.  Id. T 26, ln. 22.  The typical functions of this type of career position is taking of dictation, instant stenography of letters, memoranda, minutes, reports, among others.  Id. at 22.  Subsequently, she was transferred form the Human Resources Office to the Public Library to the position of secretary she had requested.  The typical functions of this particular position included the typing of letters, memoranda, reports, credit applications, payment vouchers, proposals, attendance sheets, employee payrolls and special payrolls, minutes, and proclamations.  Id. at 38, ln. 14, 17.  She has barely performed any of the duties described in the job description of her position.  Id. at 38 et seq. There, the Library Director has had her performing duties as a librarian aide, and her salary was reduced.

Ms. Valverdi Suris testified to incumbent PDP mayor knowing of her political affiliation because his elections committee was located close to his house.  Id. at 6, ln. 24-25.  She further explained that they would cross each other during committee activities, he visited the office where she was working and asked her for her name.  Id. at 7.  Ms. Valverdi Suris also testified, as had her husband, to the fact that she had listened to a radio program on October 21, 2000, where Negron Irizarry spoke about her allegedly distributing handbills of a political campaign against him, and spoke "disdainingly" about her specifically.  Id. at 8.  This employee has, unquestionably, complied

with a *prima facie* political discrimination case in the sense that she easily surpasses the Mayor knowing her political affiliation because she heard the Mayor speaking about her posting and hand billing offensive campaign literature.  Furthermore, the Mayor lives next to the campaign offices of the NPP where she frequently visited and she would frequently cross with him.  Moreover, he addressed her by her name prior to her transfer to a position that a reasonable jury could consider "unreasonably inferior" pursuant to Gonzalez Pina, 407 F.3d 425, and/or demeaning within the threshold as set forth by Agosto de Feliciano, 889 F.2d at 1217.

**Marissa Ramirez Negron:**  Plaintiff Marissa Ramirez Negron is a career employee who is also an activist for the NPP.  She has participated in several political activities, was the vice-president of the former NPP Mayor's political advance team, and worked as a voter mobilizer.  She testified to having been a ward president, and as vice-president, coordinated the days in which the walk-abouts would take place – time and place – lay out the route so as to properly position the advance team members, take notes every time former NPP Mayor went into a house and the person voiced his or her needs, and be "close to the mayor."  Docket No. 170 at 4-6.  She began as a Law 52 employee, but was then appointed to a career position – Office Clerk – on July 2000 where she worked at the Interagency Coordination Office located in City Hall (the Vice-Mayor's office).  There she handled the phone, took messages for the Vice-Mayor, and sorted all of the correspondence of the Municipality which arrived at her desk, stamped it, and distributed it.  She was also in charge of helping the mayor tend to the public on Tuesdays.  Id. at 16-17.

Once Negron Irizarry's Administration took office, she was transferred to the Office of Recycling due to it's Director having requested an Administrative Assistant.  There, she worked for only two or three days.  She also testified that she did not perform any duties, except for answering the phone and writing where the recycling workers were to go in order to pick up the recycling

material.  Id. at 40-42.  After her work at the Office of Recycling, she was transferred to the Municipal Public Library.  She testified that, instead of performing duties typical of an office clerk, she was performing work done by the librarians – duties which she was taught to perform six or seven months after being there (she performed no work in the mean time, or can be reasonably inferred).  Id. at 43-45.  Subsequently, during May 2002, her salary was reduced.  Nevertheless, from the beginning of her employment at the public library, she had been entering titles of books into the computerized database assisting the librarians.  Id. at 85.  She also answers the phone and takes messages, stamps the books, enters them into the database, and classifies and codifies them.  Id. at 91-92.

Finally, she alleges that incumbent mayor Negron Irizarry knew her because she was a ward president, because, once he took office, knowing she was an employee, he would visit her neighborhood quite often, and because her neighbor was as much of a political activist for the PDP as she is of the NPP.  Moreover, Negron Irizarry would often visit "her",[4] and saluted her and her mother as he walked around the neighborhood.  Id. at 50.  The matter as to knowledge by the Mayor of her political affiliation is close, but she was on a political position of trust in the office of Interagency Coordination where politics are necessary to perform her job representing the former Mayor.  The current Mayor knew of this fact because he transferred her from this trust position, where politics of the former Mayor were necessary to perform the job.  Moreover, the Mayor often visited her and saluted her personally.  Also, plaintiff testified that the Mayor was as much an activist as her.  Furthermore, a reasonable jury could determine that she was repeatedly transferred to inferior

---

[4]  The record is not clear as to whether by "her", plaintiff meant herself or her PDP neighbor. Notwithstanding, further in the record, it is reflected that defendant visited her neighbor, who used to be the secretary of Ramos Comas and his sons who are PDP senators.

positions in compliance with the "unreasonable inferior" standard of <u>Gonzalez Pina</u>, 407 F.32 425, and/or the standard of an inferior transfer to cause the employee to capitulate her political beliefs. <u>Agosto de Feliciano</u>, 889 F.2d at 1217.

Salary Decreases to Career Employees

At this point in the proceeding, the Court is not satisfied that the evidence is convincing enough to move the Court to dispense with the *Mt. Healthy* defense as to the salary decreases to some of the career plaintiff employees. Although the Court recognizes that evidence has been produced regarding the illegality of the decreases in salaries, defendants have yet to fulfill the *Mt. Healthy* test regarding the legality of these decreases and that this corrective action was equally treated against **every** employee in the same, or similar, situation irrespective of their individual political affiliations. Accordingly, defendants motion for judgment as a matter of law is **DENIED** as to **Marisol Sanabria Irizarry, Lissbette Valverdi Suris,** and **Marissa Ramirez Negron**.

3.     <u>The Internal Auditor</u>:

**Maria del Carmen Vargas Calderon:**[5]  Plaintiff Maria del Carmen Vargas Calderon is an NPP affiliate who, during the elections of 1992, ran for the Municipal Assembly for San German under the NPP insignia. In August 16, 2000, she was employed as an Internal Auditor for the Municipality. She admitted that this was a **trust** position rather than a career position. Docket No. 171, at 98, ln. 18. Said position required she be confirmed by the Municipal Assembly, which she was through Resolution 10, Series 2000-2001. She was responsible for auditing each and every

---

[5]  Although the position she held, Internal Auditor for the Municipality, is a TRUST position, at summary judgment level, the Court, in following with <u>Cordero v. De Jesus Mendez</u>, 867 F.2d 1, 17 (1st Cir. 1989), concluded that "[a]n Internal Auditor merely enforces procedural rules, ordinances, laws, and resolutions enacted by the Controller of Puerto Rico, the Municipal Assembly, and/or Legislature[...] a technocrat and nothing more." Thus, the Court resolved that her position neither related to partisan political interests or concerns, nor resembled a policymaker privy to confidential information.

dependency of the municipality, and, like every auditor, she had to make interventions into different departments and to verify that everything was done according to accounting principles. Docket No. 171, at 96, ln.12-18. Moreover, she worked independently, as auditors generally do. That is to say, she made a work plan regarding the audits she would perform that month, and handed it over to the mayor for approval. Id. at 116, ln. 3-9. She was in charge of ensuring that corrective action and/or correct procedures as to legal usage of Public Municipal Funds indicated by the comptroller was carried out. Id. at 124, ln. 2-5.

The Court has concluded that, although the position is of trust, Municipal Auditors, as opposed to Directors of Finance, do not carry within their positions partisan political interests and/or concerns as expressly decided by the Circuit Court in Cordero, 867 F.2d at 17. She left the private industry to work as the Municipality's Internal Auditor because she understood that by occupying this position, she could develop her ideas and help San German. To help the public. Id., ln. 19-24. She was substituted in her position and replaced with a PDP affiliate.

During the 2000 electoral campaigns, she participated for former NPP mayor's campaign by attending motorcades, fundraisers, and walk-abouts. Docket No. 171, at 94, ln. 4-6. She testified that Negron Irizarry must have known of her political affiliation because of the fact that she was a running candidate during the 1992 elections under the NPP insignia. Id. at 95, ln. 6-7. Moreover, they had prior contact **on two occasions** through the Shaddai Church where she was the accountant. Id., ln. 10-11. (It is up to the jury to decide whether or not these facts are sufficiently strong to show knowledge as to her political affiliation (1992 NPP candidate) and/or whether she was replaced because she was formerly the NPP selected Comptroller and could be a strong legal watchdog, and whether the Mayor wanted for the position a softer auditor, "technocrat", potentially PDP

Page 23 of  27

comptroller.)[6]

After considering Ms. Vargas Calderon's testimony as well as the 1070 Form (job description), and Resolution No. 10 (the Municipal Assembly's confirmation of Ms. Vargas Calderon as Internal Auditor), Exhibits F, and G, the Court finds that her position does not involve decision making on issues where there is room for political disagreement on goals or their implementation. In fact, her position is limited to the "examining, and analyzing [of] the accounting books, records and documents in which the different fiscal transactions are registered." Exhibit G at 1. The Internal Auditor merely verifies that the Municipality's fiscal documents are in order with the regulations and ordinances as set forth by the Comptroller of Puerto Rico.[7] It is clear that her responsibilities do not resemble those of a policymaker privy to confidential information. She, also, does not hold a function where her political affiliation is an appropriate requirement for continued tenure. Accordingly, the Court finds that Ms. Vargas Calderon has more than sufficiently made a *prima facie*-fact specific finding of political discrimination. Thus, the Court must provide defendants with the opportunity to potentially complete their *Mt. Healthy* defense, if so warranted. Defendants' motion for judgment on the merits is **DENIED** as to **Maria del Carmen Vargas Calderon**.

4.    <u>Sole Remaining Temporary Employee</u>: (terminated due to illegally appointed during electoral ban)

**Pedro Irizarry Bonilla:** Plaintiff Pedro Irizarry Bonilla was a temporary employee whose contract was funded by federal monies not related to the Law 52 grant. He had a service contract with the Municipality as Housing Inspector that began in April of 1999 that was to expire on

---

[6]  The word "technocrat" was used referring to Municipal Auditors by the Circuit Court in <u>Cordero v. De Juesus</u>, 867 F.2d at 17.

[7]  The Comptroller of Puerto Rico is not a political position in the sense of party politics and/or policies in the making or the implementation thereof.

December 31, 2000.  However, on December 29, 2000 – during the electoral statutory ban period – Irizarry Bonilla signed an extension until June 30, 2001.  Docket No. 151 at 28, ln. 18-23.  His contract was terminated by incumbent Negron Irizarry due to the insufficiency of funds with which to pay his salary five months prior to the date of expiration of his contract.  Id. at 7, ln. 20-22.  Irizarry Bonilla has been an active member of the NPP since 1980, participated as electoral college for the 2000 elections, and was part of former NPP Mayor's advance team.  He also participated in several political activities including a weekly radio program promoting the former NPP Mayor's candidacy for re-election.  He testified to having supported the campaign by fund raising at traffic lights, posting bills, and driving former NPP Mayor in the motorcades.  He was also Deputy Inspector of the electoral polling officers.  Id. at 4, ln. 15-24.  Irizarry Bonilla also testified that, outside of the meeting held at Villa Chilin, he has not had any contact with Negron Irizarry.  Id. at 5, ln. 15-16.  As to incumbent Negron Irizarry's knowledge of Irizarry Bonilla's political affiliation, he testified that it stemmed form his owning a Jeep with political signs and flags having crossed each other – and waived – on occasions during the political campaign.  Id. at 10, ln. 21-25.  He further explained that they had waived from car to car, and, as of the date of his testimony, they had never spoken.  Moreover, he clarified that "he said hello to everyone when he passed by the motorcades, he went by and I am used to saying hello to everyone, regardless of the political affiliation."  Id. at 30, ln. 6-21.  In fact, Irizzary Bonilla said that he did not know if Negron Irizarry knew he was an employee for the Municipality.  Acevedo Diaz, 1 F.3d at 66.

As with the dismissed Law 52 plaintiffs, fellow plaintiff Pedro Irizarry Bonilla's evidence is not sufficient to establish that his political affiliation was a substantial or motivating factor in defendants' decision to terminate his illegal appointment made during the electoral ban..  Moreover, the evidence adduced at trial did not move the Court to conclude that a *reasonable inference* could

be made that defendants were aware of his political affiliation at the time of his termination. Irizarry Bonilla merely rested on "having been seen" or "met during routine campaign canvassing" assertions to support his claims for political discrimination, and, as the First Circuit has held, routine meetings and salutations during routine campaign canvassing does not lead to a reasonable inference that candidate Negron Irizarry knew he was a members of the NPP. *See* <u>Vazquez Valentin</u>, 385 F.3d at 37. Plaintiffs were, thus, not able to shift the burden of persuasion to the defendants. The Court determines that there is no evidence indicative of the Mayor having known of his political affiliation at the time the contract was terminated; the fact that he was appointed by the former NPP Mayor is insufficient. There is no doubt that the reason for termination is valid because the contract was entered into during the period prohibited by law prior to elections. However, there is no proof that the decision to terminate his Law 52 contract was substantially determined by his political affiliation. Hence, the burden of proof does not shift to the Mayor to show that he would have taken the same employment decision regardless of political affiliation. *See* <u>Mt. Healthy</u>, 429 U.S. at 285-87 (see a recent explanation of *Mt. Healthy* at <u>Sanchez Lopez</u>, 375 F.3d at 131 – example provided by Circuit Judge Lynch). Accordingly, **Pedro Irizarry Bonilla's** claim is **DISMISSED**.

### IV.  CONCLUSION

Based on the aforementioned reasons, the Court **GRANTS IN PART** and **DENIES IN PART** defendants' *Motion for Judgment Under Rule 50(A)*. (Docket No. 160). Accordingly, plaintiffs **Juan Jusino Amely, Santos Olivera Rivera, Nery Casiano Rosado, Jesselle Justiniano Rosario, Felipe Velez Valle, Sylvia Flores Morales, Marla Colon Johnson,** and **Pedro Irizarry Bonilla's** claims are **DISMISSED WITH PREJUDICE**. However, plaintiffs **Nelida Baez Cruz, Jose Berrocales Baez, Marison Sanabira Irizarry, Lisbette Valverdi Suris, Marissa Ramirez**

**Negron,** and **Maria del Carmen Vargas Calderon**'s claims survive the Fed.R.Civ.P. 50(A) challenge.

**IT IS SO ORDERED.**

In San Juan, Puerto Rico, this 8th day of August of 2005.

s/ Daniel R. Dominguez<br>
**DANIEL R. DOMINGUEZ**<br>
**U.S. DISTRICT JUDGE**